IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
June 11, 2009 Session

## NANCY RANDOLPH DEAKINS v. LYNN LAMPTON DEAKINS

**Appeal from the Circuit Court for Hamilton County**
**No. 06D1225     W. Jeffrey Hollingsworth, Judge**

---

**No. E2008-00074-COA-R3-CV  - FILED SEPTEMBER 30,  2009**

---

In this divorce case, the trial court granted Nancy Randolph Deakins ("Wife") a divorce from Lynn Lampton Deakins ("Husband") thereby ending the parties' 24-year marriage.  Upon dissolving the marriage, the court valued and divided the marital estate, declined Husband's request for alimony, and awarded Wife discretionary costs, her attorney's fees and court costs.  Husband challenges each of these determinations as well as an evidentiary ruling and the court's finding that Husband dissipated assets. We reverse the awards to Wife of attorney's fees and discretionary costs.  We affirm the remainder of the trial court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court**
**Reversed in Part and Affirmed in Part; Case Remanded.**

CHARLES D. SUSANO, JR., J., delivered the opinion of the court, in which JOHN W. MCCLARTY, J., joined.  D. MICHAEL SWINEY, J., filed a separate concurring opinion.

John T. Rice, Chattanooga, Tennessee, for the appellant, Lynn Lampton Deakins.

Glenna M. Ramer, Chattanooga, Tennessee, for the appellee, Nancy Randolph Deakins.

**OPINION**

I.

Both parties had completed college when they married on December 31, 1983.  They had two children, a daughter born in 1986 and a son born in 1989.  Wife filed for divorce in 2006, citing inappropriate marital conduct and irreconcilable differences.  Trial was held over two days in June and July 2007.  At that time, Wife was 51 and Husband was 55.  Their daughter was an adult, in her final semester of college, and their son would turn 18 in July 2007 and was preparing to leave for college.  Accordingly, custody and child support were not at issue.

Husband graduated from Vanderbilt in 1974 with a degree in business administration and began working the same year as a manufacturer's sales representative for his father's firm, Pearson, Deakins and McGinnis. The company supplied parts to stove companies. After his first year, he received a company car, insurance benefits, and a retirement plan. He earned an annual income of as much as $50,000. Wife had two bachelor of arts' degrees, one in sociology from Tulane and another in art history from the University of Tennessee. After college, she too began working at her family-owned business, Hardwick Clothes, a manufacturer of men's clothing. Initially, she worked in quality control at the plant. During much of the marriage, she worked part-time for $20,000 a year. By the time of trial, she served as advertising director for the company, earning $43,800 a year.

In 1984, the parties purchased a home on Lookout Mountain, Tennessee, for $175,000. Husband and his father contributed $125,000 toward the purchase. Wife's father added another $25,000, and Husband assumed a $12,000 mortgage from the previous owners. The house was titled in both parties' names and was owned free of debt within four years. As of September 2006, the home was appraised at $500,000.

Wife brought no real property to the marriage. While Husband testified that he owned no real property at the time of the marriage, the record reflects that, at some point, he became a joint owner with his sister of a 112-acre tract of land off of Scenic Highway on Lookout Mountain, Georgia. As to personalty, Wife had some furniture and Husband had "a bed and a garbage can." Wife also had some stock her grandmother had given her and Husband had several investment accounts.

At the beginning of their marriage, both parties continued working full-time. Wife paid all the household expenses from her salary supplemented by $1,000 that Husband gave her each month. Husband used the remainder of his income for his discretionary spending, including maintaining his three golf club memberships. Wife handled all of the household chores and gardening; before they purchased a house, Husband told her, "I don't do yard work." After their daughter was born, the parties agreed that Wife would work part-time. Other than this, the parties' arrangements stayed the same: Wife took care of the household, with some help from a housekeeper she hired, cared for the children, and continued to receive $1,000 a month from Husband to help pay the bills. Wife either "worked from what she had" or used money from her mother. Husband and Wife drank socially and hosted parties at their home. As the children grew older and completed elementary school, Husband stopped attending church with the family and began to drink more. Between the births of their children, Wife became pregnant with a child who had no chance of survival and a miscarriage was induced. Wife said Husband was unsupportive, made her feel that she was at fault and told her not to discuss the matter with anyone. Wife continued to work part-time because the family needed her $20,000 salary and benefits. Wife said Husband did not buy things for the children or take them to appointments and was generally uninvolved in their care. Wife was active in their school and other activities, while Husband's participation was limited to attending their sporting events and special performances.

Husband testified that in the first years of their marriage, each party had sufficient income for their personal spending above the household expenditures. Wife disagreed and said that during the years that Husband contributed $1,000 a month to the household and children's expenses, she

was in need of more money but that Husband refused her request based on their agreement. Husband disagreed with their daughter's decision to attend GPS instead of Baylor, the high school he had attended. He denied that he refused to pay his daughter's tuition, but acknowledged that Wife paid for her schooling. Husband felt that he had a "good" or "fine" relationship with both children.

Husband resigned from his father's company in 1995, the same year the business closed. He had not taken a salary for the prior two years because the company had gone into decline. During those years, Husband did not contribute his regular $1,000 a month toward household expenses. As a result, Wife received more help from her parents. In 1996, Husband took a job as an investment advisor at A.G. Edwards. In an effort to help Husband, Wife had her family move their investment portfolio of one to two million dollars to Edwards. Wife said Husband did not seem eager to work there, worked short days, and resigned or was forced to leave after 18 months. Husband did not work again during the last ten years of the parties' marriage despite Wife's and his friends' efforts and encouragement to help him find a job. His drinking became problematic. Although Husband was never violent, he became belligerent. After he ceased working, Husband's activities were largely limited to playing golf, drinking, and sometimes taking his son to and from school. He began staying up nights, drinking, and sleeping late into the next day. Wife said she stayed in the marriage mostly for her children. She filed for divorce in 2006 when she was no longer able to deal with Husband. She recalled he was unsupportive and told her to "move along" when her mother died suddenly in 1996. Wife spoke to a doctor, a friend of Husband's, about Husband's drinking; she also encouraged him to see his primary care physician. Both doctors prescribed Valium to "take the edge off the detox" efforts, but "that presented a whole 'nother problem." Wife also talked to Husband's family and ultimately asked his friends to do an intervention. In the last six months before the intervention, the situation became "really bad" and Wife offered to rent an apartment for Husband, but he refused to leave "his" house.

Both parties' friends testified to Husband's drinking problem and the parties' relationship. Theodore Caldwell knew Husband since childhood. They regularly fished and golfed together and both had club memberships at Honors, Mountain City Club and Lookout Mountain Golf Club in the Chattanooga area. Caldwell conceded that he and Husband drank "quite a bit" when out together, but not to excess when with their families. He concluded that Husband had a problem when he discovered that Husband often got drunk alone at his home late at night. Caldwell tried in a friendly manner to discuss Husband's drinking with him, but Husband showed a "strong sense of denial" and made it clear to Caldwell and mutual friends that "this was not your territory." Caldwell encouraged Husband to seek a new job, but, again, Husband had a "very strong defensive mechanism when it came to talking about his income or how much of an effort he was making to get work or to quit smoking or to quit drinking." Caldwell was of the impression that Husband did a lot of personal investing and that Husband and Wife made equal contributions to the family expenses, but Wife had "recently" advised that this was not the case. When he tried to discuss the matter with Husband, he became defensive and angry and refused to answer specific questions. Caldwell said that, over the past ten years, he continued to invite Husband to lunch, but often found that Husband was still in bed and drunk. He concluded it was obvious since at least 1996 that Husband had a drinking problem. Over time, he became frustrated with Husband because Husband would tell him about his health issues but then skip appointments with his doctor. Caldwell was aware that Wife had talked to their

common friend, Dr. John Bolinger, to try to get Husband some professional help, but Bolinger had told Caldwell he did not believe Husband was an alcoholic.

Donna Ziebell, Wife's cousin, saw Wife at least twice a week and had socialized with both parties. She helped Wife in her flower arranging business and other small endeavors that Wife tried to supplement her income. Ziebell said Husband put down Wife's efforts and made unflattering comments about Wife's appearance. Ziebell observed that Wife did all the cooking, cleaning, caring for the kids, and entertaining of both parties' families – Wife worked "like a dog . . . and it was a thankless job." Ziebell knew Husband had a drinking problem because she would often visit when Husband was still in bed late into the afternoon. In earlier years, when they socialized, Ziebell heard Wife repeatedly telling Husband that he had had enough to drink.

Shelby Montague became acquainted with Wife through their children and she and Wife worked on a big school fundraiser together over the past five years. When Montague commented that she and Wife were proud of their efforts, Husband commented, "all I know is I'm not getting my dinner every night."

Frank Jarnigan, III, was a friend of Husband for the past 15 years. He had socialized with Husband and Wife and, while he agreed that Wife drank socially, he noted that she did not drink to excess. He surmised that Husband had developed a drinking problem in recent years when Husband began declining invitations to leave the house after he stopped working. When Jarnigan suggested that Husband do volunteer work so he would be on the same schedule as his family and spend some quality time with them, Husband declined, saying he "didn't do well with volunteer work." Husband talked about getting a job, but Jarnigan was not aware that he ever went for an interview or made other specific efforts. When he asked Husband to get help for his alcoholism, Husband denied a problem.

Just before she filed for divorce, Wife called Jarnigan asking for help with Husband. She told him that Husband had not slept in over a week and she was concerned about him. Jarnigan and Caldwell went to the house and found Husband in a "frightening" condition; he was drunk, wearing a down coat and underwear, his whole body and face were "swollen," and he appeared not to have bathed for days. Husband refused their demand that he go for treatment until they threatened to call Husband's family and friends one by one if he did not cooperate. Husband was admitted to the hospital and then to a treatment program. Jarnigan was aware that Husband intended to return to the marital home after treatment, but Wife would not let him. In Jarnigan's opinion, Wife had treated and continued to treat Husband with respect and had made a point to invite Husband and his family over for special occasions and to see the children.

David Brown, director of CADAS, the out-patient drug and alcohol treatment rehabilitation center where Husband was treated, testified that alcoholism is considered a disease by the American Medical Association. He generally explained that "enabling" is allowing a person with a problem to continue to operate without any consequences. For example, a spouse who allowed an alcoholic to live in a situation and continue using alcohol was an "enabler."

-4-

At the time of the trial, Husband had not drank alcohol since June 6, 2006, the date of the intervention. He had undergone various treatments, including six weeks as an in-patient at Cumberland Heights rehabilitation center and at CADAS. At the end of his treatment, Wife did not allow him to live in the family home again.

During the marriage, Wife inherited stock in Exxon and other stocks from her grandmother. Her parents died within six months of each other in 1996. Wife received $500,000 in life insurance benefits from her mother's death and stock worth about $200,000. She placed the money in an Edwards' account earmarked for the children's education. When her father died, she inherited another $1.3 million in the form of stocks, an IRA, and Dreyfus and Fidelity funds. The stocks included Exxon stock that had increased in value to $539,000 at the time of the trial. Many of the stocks she received from her father were sold during the marriage. Wife separately maintained the Fidelity and Dreyfus funds and her Hardwick Clothes stocks and transferred the remaining stocks to the Edwards' accounts. Wife did not commingle the monies and neither party added any contributions to the accounts so that any appreciation was solely the result of market forces. Wife named the children as beneficiaries of the various Edwards' accounts; Husband's name was never placed on any of Wife's accounts. The business of Wife's family, Hardwick Clothes, was not publicly traded; Wife was a shareholder with fifty others, but received no dividends the past two years because the business was suffering and had lost half its employees. Her vested pension of $537 per month was projected to be $847 at her retirement and she also had a 401(k). Wife identified a long list of furniture she inherited from her grandparents and her mother, some of which pieces Husband proposed that he should receive in the property division. In all, Wife estimated her inheritance at $2.5 million. She obtained multiple "I.O.U.s" signed by Husband for loans she had made to him from withdrawals she took from her primary Edwards' account. Wife had maintained health insurance for the whole family since 1996, paid all the children's private school and college tuition, and paid storage fees for Husband's boat. She refused to pay for Husband's golf club dues.

Husband's pension and profit sharing plan from his family business was valued by the trial court at $777, 873.[1] Husband had a self-funded IRA and both parties had Roth IRAs. Husband was the sole trustee of his family trust, "Babbington Hall Trust." Husband said the interest and dividends went to support his aunt. He testified that she was not permitted to touch the principal. Upon his aunt's death, the trust is to be evenly split between Husband and his sister. Husband said that under his father's will a separate trust was created that would give Husband the first $700,000 from his mother's estate when she passed; at the time of the trial, she was 87 and in good health.

At some point before or early in the marriage, Husband took out a $50,000 loan at Pioneer Bank[2] to buy some stocks for investment purposes. He agreed that he received the proceeds from the loan and that Wife got no benefit from them. Husband said when he had funds, he "chose not

---

[1]This figure is from the testimony of Edwards' adviser, Mr. Klose. Husband testified that the plan's balance at the time of trial was $864,000; this latter figure is consistent with the figure Wife listed on her asset and liability statement based on a March 2007 statement.

[2]The date the loan originated is unclear; Husband could not recall whether he took out the loan before or during the marriage. No supporting documents pertaining to the loan were introduced at trial.

to pay [the loan] off." Wife eventually agreed to Husband's request that they take out a home equity line of credit ("HELOC") to repay that loan. Wife acknowledged that she signed the deed to permit the HELOC on the marital home, but "stupidly" believed that $280,000 referenced in the paperwork indicated the value of the home, not the available credit line. Only Husband was on the HELOC note and, after repaying the bank loan, Husband continued withdrawing money for his personal expenses, including club dues, and eventually made withdrawals to pay the HELOC payment itself. He acknowledged that Wife made no withdrawals and that she was unable to stop him from accessing the credit line until an injunction was issued as a result of the divorce filing. Husband estimated his club bills totaled $2,000 a month. In 2003, Wife began making some of the HELOC payments because she was afraid the house was at risk and Husband had not made good on his promises to make the payments. Husband agreed that the parties discussed over and over again Husband's agreement to sell the acreage he owned and pay off the HELOC.

Beginning in 2002, Wife had Husband sign IOUs for withdrawals he made from her account to pay toward the HELOC, half of the children's educational expenses, and for funds she gave directly to Husband. Husband signed $150,000 in IOUs but did not sell his land. He received two offers averaging $400,000 but declined both, believing that the property was worth more. At the time of trial, the HELOC had an outstanding balance of $257,000, and Husband had made no payments since 2006. In March 2007, Wife made a $10,000 payment after she received a notice indicating that absent the payment, foreclosure proceedings would begin. Wife acknowledged she received monthly statements for the HELOC and was aware its balance was increasing, but indicated she was unable to limit Husband's access because the loan was in his name alone.

Robert Klose, a financial consultant at Edwards, became Wife's adviser after Husband left the company. Wife had an IRA that was funded by money from both her parents' estates, an IRA that was a direct rollover of her father's IRA at his death, her own IRA, and the "education account" for her children funded by her inheritance. Wife had made no further deposits to her investment and retirement accounts and their growth was a function of "market forces only." Klose also managed Husband's family trust of which Husband was the trustee – its value was $834, 859.

Husband had no supporting documents, but guessed that his pension plan had $200,000 in it at the time of the marriage. He agreed that he gave Wife a total of $12,000 a year for seven of the years they were married. Husband agreed that, but for Wife's money, the marital home would have gone into foreclosure.

Wife drove a 2001 Suburban and Husband had a 1997 Lincoln Towncar, both of which Wife bought. Wife also purchased vehicles for both children. According to Wife, Husband had given the Towncar to a friend but refused to sign the title over so that Wife could cancel the insurance on that car. Wife continued to pay the insurance. As of the trial, Wife had incurred $6,500 in attorney fees and $7,500 in expert witness fees.

Husband conceded that his main source of income during the past several years was the HELOC. Asked whether he was in need of rehabilitative alimony to get some type of job, Husband was unsure. He said in 2006 he filed a job application with First Tennessee Bank. At the time of the trial, Husband lived in a one-room apartment over a strip mall that he rented for $410 a month. He had some furnishings and personal belongings, a cell phone, and two paid-for cars. He said he

ate out every meal for $20 a day, but bought no clothes. Husband suffered from high blood pressure, kidney problems, and torn cartilage in his knee. He said that, after the divorce, he would lose the health insurance that Wife had been providing him. Husband said his health condition had stabilized, but his bad knee prevented him from doing manual labor.

The trial court granted Wife a divorce based upon Husband's inappropriate marital conduct. In a subsequent order denying Husband's motion to alter or amend, the trial court clarified that the inappropriate conduct was not Husband's alcoholism, but his dissipation of assets and "the remoteness of this relationship both with his wife and his children." The court denied Husband's request for rehabilitative alimony.

The trial court valued each party's separate property. Wife's separate property was valued at $1,807,775.50 and included her primary Edwards' account, stocks and funds she inherited from her grandmother and father, the privately held Hardwick Clothes stock, and inherited furniture. Husband's separate property was valued at $1,092,000 and included his anticipated inheritance in excess of $700,000 through his father's will and the undivided interest in the acreage he owned with his sister, valued at $392,000. With regard to the marital property, the trial court awarded Wife the marital home subject to the HELOC balance, her pension plan and 401(k), the "education account" at Edwards, a Roth IRA, the Edwards' "beneficiary" account, all furnishings in the marital home, and her car. Husband was awarded a golf club membership, his pension and profit sharing plan, two Edwards' IRA accounts, the furnishings in his possession, and his car. Of the $1,764,281 in marital assets, Wife was awarded $913,792 and Husband received $850,489.

In summary, the court ordered as follows:

1. [Wife] is awarded a divorce upon the inappropriate marital conduct of [Husband].

2. [Husband's] request for rehabilitative alimony is denied.

3. Each party will retain their separate property . . . .

4. The marital property will be divided as set forth in this memorandum order.

5. [Husband] will pay [Wife] $327,000. Said payment to be completed no later than two years from the date of this Order.

6. A lien will attach against [Husband's] separate real property to secure payment of the amount due to [Wife]. The lien will be released upon full payment.

7. Upon full payment of the amount due to [Wife], the I.O.U.'s signed by [Husband] will be considered forgiven and not owed.

8. The Court awards [Wife] $6,500.00 in attorney fees and $3,000.00 in discretionary costs . . . for expert witness fees . . . .

9. Court costs are assessed against [Husband] . . . .

Husband filed a timely notice of appeal.

## II.

Husband raises the following issues for our review:

1. Did the trial court err in failing to award Husband alimony?

2. Did the trial court err in admitting the testimony of Rhonda Champion as an expert witness and awarding related fees?

3. Did the trial court err in its finding of dissipation of marital property by Husband?

4. Did the trial court err in its division of the marital property?

5. Did the trial court err in awarding attorney's fees and costs to Wife?

6. Did the trial court err in failing to award Husband his attorney's fees?

Wife raises an additional issue of her entitlement to her reasonable attorney's fees on appeal.[3]

## III.

## A.

Our review of the trial court's findings of fact is *de novo* upon the record of the proceedings below, accompanied by a presumption of correctness, a presumption we must honor unless the preponderance of the evidence is against those findings. Tenn. R. App. P. 13(d); ***Wright v. City of Knoxville,*** 898 S.W.2d 177, 181 (Tenn. 1995); ***Union Carbide Corp. v. Huddleston***, 854 S.W.2d 87, 91 (Tenn. 1993). There is no presumption of correctness as to the trial court's conclusions of law. ***Kendrick v. Shoemake,*** 90 S.W.3d 566, 569 (Tenn. 2002); ***Campbell v. Florida Steel Corp.***, 919 S.W.2d 26, 35 (Tenn. 1996).

---

[3]In the final sentence of the "conclusion" section of his brief, Husband asserts that this court "should award [Husband] his attorney's fees on this appeal." Because Husband failed to raise this "issue" in the "issues presented" section of his brief, together with appropriate argument and citations to authority, we decline to consider his request.

B.

A trial court has broad discretion in fashioning a division of marital property. ***Fisher v. Fisher***, 648 S.W.2d 244, 246 (Tenn. 1983); ***Barnhill v. Barnhill***, 826 S.W.2d 443, 449-50 (Tenn. Ct. App. 1991). It has the same broad discretion with respect to an award of alimony. *See **Aaron v. Aaron***, 909 S.W.2d 408, 410 (Tenn. 1995).

In determining whether a trial court has abused its discretion, we are bound by the principle that the trial court "will be upheld so long as reasonable minds can disagree as to propriety of the decision made." ***Eldridge v. Eldridge***, 42 S.W.3d 82, 85 (Tenn. 2001) (quoting ***State v. Scott***, 33 S.W.3d 746, 752 (Tenn. 2000) and ***State v. Gilliland***, 22 S.W.3d 266, 273 (Tenn. 2000)). A trial court abuses its discretion when it "applie[s] an incorrect legal standard, or reache[s] a decision which is against logic or reasoning that cause[s] an injustice to the party complaining." ***State v. Shirley***, 6 S.W.3d 243, 247 (Tenn. 1999) (citation omitted). An appellate court cannot substitute its judgment for that of the trial court. *See **Myint v. Allstate Ins. Co.***, 970 S.W.2d 920, 927 (Tenn. 1998).

IV.

Husband contends that the trial court erred in denying his request for rehabilitative alimony. He asserts it was clear that "he was the disadvantaged spouse and in need and [Wife] had the ability to pay." In denying alimony, the trial court stated as follows:

> In the pleadings, the husband requested rehabilitative alimony. However, during testimony, the husband stated that he was not certain he needed alimony. The Court finds that the evidence clearly indicates the husband does not need rehabilitative alimony and none will be awarded.

Husband argues that he demonstrated need by showing that his only asset to live on is his pension and profit sharing plan. He adds that Wife "now lives in a 4,000 square foot home with a value of $500,000.00 while [he] resides in a one bedroom apartment over a strip mall paying $410.00 a month, food bill of $20.00 a day." At trial, Husband testified about his request for alimony:

> Q: Do you believe you are in need of rehabilitative alimony to rehabilitate and to get some type of job?
>
> A: I don't know. I don't know, sir. I would like to take some computer courses.
>
> Q: Do you think you could be trained in computer courses so that you can earn a living?
>
> A: Yeah.

In determining alimony, a trial court shall consider the relevant factors set forth in Tenn. Code Ann. § 36-5-121(i)(1-12) (2005). Those factors include:

(1) The relative earning capacity, obligations, needs, and financial resources of each party, including income from pension, profit sharing or retirement plans and all other sources;

(2) The relative education and training of each party, the ability and opportunity of each party to secure such education and training, and the necessity of a party to secure further education and training to improve such party's earnings capacity to a reasonable level;

(3) The duration of the marriage;

(4) The age and mental condition of each party;

(5) The physical condition of each party, including, but not limited to, physical disability or incapacity due to a chronic debilitating disease;

(6) The extent to which it would be undesirable for a party to seek employment outside the home, because such party will be custodian of a minor child of the marriage;

(7) The separate assets of each party, both real and personal, tangible and intangible;

(8) The provisions made with regard to the marital property, as defined in § 36-4-121;

(9) The standard of living of the parties established during the marriage;

(10) The extent to which each party has made such tangible and intangible contributions to the marriage as monetary and homemaker contributions, and tangible and intangible contributions by a party to the education, training or increased earning power of the other party;

(11) The relative fault of the parties, in cases where the court, in its discretion, deems it appropriate to do so; and

(12) Such other factors, including the tax consequences to each party, as are necessary to consider the equities between the parties.

Among the cited factors, the "real need of the [disadvantaged] spouse seeking the support is the single most important factor . . . [and next] the courts most often consider the ability of the obligor spouse to provide support." ***Aaron v. Aaron***, 909 S.W.2d at 410. In declining to award Husband alimony, the trial court focused exclusively on need and relied on its finding that the evidence, particularly Husband's own limited testimony, simply did not demonstrate a showing of need.

The proof showed that Husband had a business degree from Vanderbilt that enabled him to earn up to $50,000 a year plus benefits when he worked during the 1980's and '90s. After he left his father's company, he obtained a position as an investment advisor for a respected financial firm. Testimony from Wife indicated that Husband lost that job because he was unenthusiastic about his work, went to the office late and returned home early each day until he was ultimately forced to leave. Husband claims that he has only his pension and profit sharing plan to live on. As to that asset, it is substantial and was awarded to Husband in its entirety. Husband testified that the plan had an estimated value of $200,000 at the time of the marriage and was worth $864,000 at the time of the trial. About five years earlier, Husband took out a $50,000 loan against the plan and it had a remaining balance of $11,000 to be repaid in 2007. Once Husband repaid that amount, he could begin to borrow against the plan at age 56 without penalty.[4] Husband testified that the earned interest on the plan at 6% was roughly $50,000 a year. Husband testified that he could live off of that amount alone, without ever invading the principal.

With respect to his other assets, Husband jointly owned valuable land with his sister. He also had a regular IRA and a Roth IRA that the trial court valued at $36,127 and $21,182, respectively,[5] and a $7,500 club membership. Further, Husband testified to the anticipated inheritances he would receive from his family trust and his mother's estate. Husband testified he expected to receive at least $700,000 from the latter and had already received a $10,000 "loan" from his mother's estate in July 2006. Lastly, the record did not indicate any apparent barrier preventing Husband from using his education and training to gain new employment; Husband's health had "stabilized" following his successful treatment for alcoholism, and, by his own testimony, he was open to working other than at a position involving manual labor.

In summary, the evidence does not preponderate against the trial court's finding that Husband failed to show a need for spousal support. Moreover, we have undertaken a review of the remaining factors and conclude that, overall, they do not support an award of alimony to Husband under the evidence in the record. More specifically, of the remaining factors, only two, in our view, – Wife's ability to pay and the duration of the marriage – lean at all in favor of an alimony award. Again, however, the proof supports the trial court's finding of a clear lack of need – the threshold factor. The evidence does not preponderate against the trial court's decision to deny Husband an award of alimony.

---

[4]The record reflects Husband's date of birth is October 25, 1951; he would reach age 56 in 2007.

[5]The court noted that Husband had made withdrawals from each of these accounts and was responsible for any repayment due. Husband testified that the combined balance of the accounts at the time of the trial was $20,000 after the withdrawals he had taken during the pendency of the divorce proceedings.

-11-

V.

Husband next complains that the trial court failed to exclude, in its entirety, the testimony of Rhonda Champion, an accountant proffered as an expert witness by Wife. Champion testified to her experience doing forensic accounting in divorce litigation such as determining the value of businesses and other asset valuation and checking tax returns. Husband asserts that Champion's testimony did not qualify as expert testimony; according to him, it amounted to nothing more than reviewing account statements and other information provided by Wife and "doing the math" to show the withdrawals Wife made from her Edwards' account in the latter years of the marriage. Husband further contended that, because Champion was merely a "fact witness," she would not be entitled to an expert witness fee. We agree on both points.

In pre-trial argument, Husband objected to Champion testifying at all, arguing that her methodology and the theory underlying her calculations – that Wife "spent this much money the last ten years and therefore . . . [she wants] half of it back"– were not accepted in the industry and unsupported by any legal authority for the court to consider in dividing the parties' property. Wife's counsel explained that Wife planned to use this evidence, not in order to ask for the money to be returned to her, but in an effort to show why it would be fair and equitable for the court to make a disproportionate division of the marital property in Wife's favor. The court initially questioned the acceptability of the analysis Champion used and the relevance of her testimony, if allowed. The following exchange occurred, in relevant part:

> [Counsel for Wife]: In large part, Rhonda Champion is really a fact witness. I think perhaps changing our lens, our collective lens on that issue would help. What she did was actually looked at the data in this case. Now, with regard to the information prior to the calendar year 2002, she didn't have complete data, but from 2002 through 2006 for that five-year period of time, she actually looked at all of the A.G. Edwards statements, credit card statements, bank statements, and what she did was a compilation of the household expenses and the sources of income with the objective of determining how much money [Wife] pulled out of her A.G. Edwards account. And then she said if there had been a 50 percent contribution from [Husband], then this amount of money would have been replaced or restored. Well, I guess we could argue about whether or not that's helpful to the Court. Your Honor, I would submit that it is.

> \* \* \*

> [T]he dissipation by one party or the other is clearly an issue that is relevant in the manner in which the Court makes an equitable division of the marital assets. So it's our position today that the fact that [Wife] invaded her separate account to the tune of more than a million dollars in order to support this household is clearly admissible

on the issue of how the Court makes an equitable division of the marital assets in this case.

So I really would like to suggest that more than being an expert, Rhonda Champion has compiled the evidence in a view. With the view toward having it all in a digestible form so the Court can tell exactly the quantity of the encroachments made by [Wife].

\* \* \*

The Court: What you are telling me is that she just did the math?

[Counsel for Wife]: She did the math. That's right.

\* \* \*

[Husband's counsel]: Your Honor, [counsel] changes horses in midstream and because she listed Rhonda Champion as an expert, Rhonda Champion submitted no records, no report. I took her deposition over 30 days ago, and here [Wife] . . . said, No, she just did the math, but yet [Wife] paid her over $10,000 to do the math. The Court is well aware that this methodology Ms. Champion admits she never used before. It's never been used in Court before. It's not a dissipation of asset [sic] of the case.

\* \* \*

The other thing I want the Court to consider is the waste of time. If [counsel] wants to argue that [Wife] spent a million dollars and my client should pay back $512,000 that's fine. She can make that argument, but don't come in with expert interrogatories, call Ms. Champion an expert, and then come back and say, No, she just did the math. Now, they sent her out as an expert. I spent the money, the time, and the effort to take her deposition, and she clearly by her own testimony is not qualified . . . .

The Court: Isn't that an issue for later if we get into discretionary costs?

[Husband's counsel]: Yeah, but the fact is . . . we can spend two hours with Ms. Champion, and then she is not qualified under McDaniel.

\* \* \*

-13-

I just want to throw these numbers at the Court. There has to be some reason that these numbers come in in the equation to divide these assets. We feel the Motion should be sustained.

[Wife's counsel]: Your Honor, I suppose [Wife] could have laboriously gone through this data and compiled it, but she doesn't have the expertise or the ability to do that. Rhonda Champion did. I submit that to the extent that [counsel] is complaining about some of her categories or the accurateness of some of those categories that that's something that he can cross-examine her about. . . .

[Husband's counsel]: Your Honor, the rule says that expert opinion must substantially assist, not just assist. If Ms. Ramer had given me all those documents, I could have done the math. But that theory is not accepted by the Supreme Court. . . . The Court has a duty as the gate keeper to make sure this type of science does not get in the record when it cannot substantially assist in a division of assets. And one other thing I completely left out of Ms. Champion's equation is she takes a snapshot, '96 to [2002] that she cannot support, 2002 to 2007, well, she didn't take a snapshot of the first 14 years of the marriage.

The Court: That's a weight issue. [C]learly, anything prior to 2002 from reading through what I have read through and what I have heard, . . . I am not going to allow her to testify even as a fact witness anything prior to 2002 because I think she necessarily just based on the incomplete records that she was given she would have to speculate, and I can't allow her to do that. I will allow her to testify as to what sums were spent from the accounts from 2002 to 2006. I am having a problem with her being able to assume how much of that was household expenses, and I think I may have to take that on an item by item basis.

Ultimately, Champion testified regarding the spreadsheet she prepared for the years 2002 to 2007 showing the total amount of money Wife spent each year in 29 categories, including everything from clothing, dining and education, to the HELOC payments, credit cards, yard maintenance, etc. She noted the sources of the payments, including the total withdrawals from Wife's primary Edwards' account. Champion admitted that her calculations were based on an assumption that each party was responsible for and consuming 50% of household expenses with some further assumptions made with respect to the purpose of certain expenditures based on information provided by Wife. She did not talk to Husband or review his accounts or finances.

The Tennessee Supreme Court has articulated the considerations applicable to an award of discretionary costs. In *Owens v. Owens*, 241 S.W.3d 478, 496-97 (Tenn. 2007), the Court explained:

Tenn. R. Civ. P. 54.04(2) empowers the trial courts to award the prevailing party certain litigation expenses. These expenses include "reasonable and necessary court reporter expenses for depositions or trials, reasonable and necessary expert witness fees for depositions or trials, and guardian ad litem fees." The purpose of awarding these costs is not to punish the losing party but to make the prevailing party whole.

Awards of discretionary costs are, naturally, decisions that lie within the sound discretion of the trial court. The trial court is free to allocate costs among parties as the equities of the case demand. Therefore, we employ a deferential standard when reviewing decisions either to award or to deny discretionary costs.

When discretionary costs are awarded in divorce cases, they are generally awarded to the spouse who is granted the divorce.

(Internal citations omitted). Regarding expert witness testimony, Tennessee Rule of Evidence 702 provides as follows:

If scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise.

In the present case, it appears that Wife conceded and the trial court accepted that Champion was testifying not as an expert, but as a lay witness. The trial court voiced no doubt regarding her expertise in accounting, but observed that in the present case, she basically reviewed statements and information provided by Wife, decided what categories Wife's expenditures fit in, and added up the totals over a five-year period. The trial court made no finding that her testimony or opinion of Wife's expenditures was of substantial assistance to its understanding of the evidence or its factual findings regarding division of the marital estate. We think it is clear that Ms. Champion was not an expert witness, particularly based on the limited financial "snapshot" to which she was permitted to testify. This is not to say that her testimony was of no benefit, only that her opinion did not rise to the level of expert proof under Rule 702. We think the court concluded as much when it confirmed that Champion "just did the math." In summary, we conclude that the trial court properly permitted Champion's testimony, but as a layperson rather than an expert witness.

In view of our conclusion that Champion did not testify as an expert witness in this case, we must agree with Husband's conclusion that the trial court erred in awarding Wife discretionary costs for her services. As noted, Wife was awarded a total of $3,000 in discretionary costs. According to her asset and liability statement, Wife incurred a total of $7,500 for "expert fees" – presumably $500 for Gus Glascock, the home appraiser, in addition to the $7,000 charged by Champion. We note that even had Champion testified as an expert witness, we would have reversed the award based

on Wife's failure to move for the costs under Rule 54.04(2). "A party is not automatically entitled to discretionary costs under Tenn. R. Civ. P. 54.04(2) simply because it prevailed." *Scholz v. S.B. Int'l, Inc.*, 40 S.W.3d 78, 84 (Tenn. Ct. App. 2000) (citing *Benson v. Tennessee Valley Elec. Coop.*, 868 S.W.2d 630, 644 (Tenn. Ct. App. 1993)). "However, courts generally award discretionary costs if they are reasonable and *if the prevailing party has filed a timely, properly supported motion*." *Id; see also Tomanelli v. Tomanelli,* E2007-01864-COA-R3-CV, 2008 WL 2811316 at * 6 (Tenn. Ct. App. July 22, 2008)(affirming the trial court's refusal to award discretionary costs for expert services where the prevailing party "failed to provide the [c]ourt with sufficient information regarding the costs she sought to recover for the [c]ourt to determine whether the costs fell within the provisions of Rule 54.04(2) and also whether the costs were reasonable and necessary")(emphasis added). In view of all of the foregoing, we reverse the award of discretionary costs to Wife.

## VI.

### A.

Husband contends that the division of the marital estate is not equitable. Husband generally concludes that the trial court erred by (1) failing to order the marital home sold, the proceeds divided, and the HELOC paid off, and (2) relying on its finding that Husband dissipated assets in awarding a judgment against Husband, thereby encumbering his separate property. In view of Husband's argument, we address together the issues of whether the division of property was equitable and whether the trial court erred in finding dissipation of assets by Husband.

Once the trial court has classified the parties' property as separate or marital, it must fashion an equitable division of the marital property as guided by consideration of the relevant factors set forth in Tenn. Code Ann. § 36-4-121(c) (2005).[6] *Kinard v. Kinard*, 986 S.W.2d 220, 230 (Tenn.

---

[6] Tenn. Code Ann. § 36-4-121(c) provides as follows:

> In making equitable division of marital property, the court shall consider all relevant factors including:
>
> (1) The duration of the marriage;
>
> (2) The age, physical and mental health, vocational skills, employability, earning capacity, estate, financial liabilities and financial needs of each of the parties;
>
> (3) The tangible or intangible contribution by one (1) party to the education, training or increased earning power of the other party;
>
> (4) The relative ability of each party for future acquisitions of capital assets and income;
>
> (5) The contribution of each party to the acquisition, preservation, appreciation, depreciation or dissipation of the marital or separate property, including the

(continued...)

-16-

Ct. App. 1998). "The fairness of the property division is reflected in the end results, and a property division is not rendered unfair or inequitable merely because it is not precisely equal or because each party did not receive a share of every marital asset." *Schuerman v. Schuerman*, M2007-00173-COA-R3-CV, 2007 WL 3072770 at *3 (Tenn. Ct. App. Oct. 22, 2007); *Kinard*, 986 S.W.2d at 230. Trial courts have broad discretion in fashioning an equitable division of marital property, *Jolly v. Jolly*, 130 S.W.3d 783, 785 (Tenn. 2004); *Fisher v. Fisher*, 648 S.W.2d at 246 (Tenn. 1983), and appellate courts must accord great weight to a trial court's division of marital property. *Wilson v. Moore*, 929 S.W.2d 367, 372 (Tenn. Ct. App. 1996).

In dividing the marital estate, the trial court made the following findings pursuant to Tenn. Code Ann. § 36-4-121:

> 1. The marriage is of long duration (24 years).
>
> 2. Each party is about the same age and has equal vocational skills and earning capacity. The difference in the parties is their willingness to work and utilize those skills.
>
> 3. Each party has the ability for future acquisition of capital assets and income. The husband, in particular, stands to inherit substantial sums of money. The husband is already the owner of an undivided one-half interest in 112 acres of valuable Lookout Mountain real estate and, according to his own testimony, may well inherit over $700,000 in cash from his mother's estate. The wife has already inherited a substantial estate.

---

[6](...continued)

contribution of a party to the marriage as homemaker, wage earner or parent, with the contribution of a party as homemaker or wage earner to be given the same weight if each party has fulfilled its role;

(6) The value of the separate property of each party;

(7) The estate of each party at the time of the marriage;

(8) The economic circumstances of each party at the time the division of property is to become effective;

(9) The tax consequences to each party, costs associated with the reasonably foreseeable sale of the asset, and other reasonably foreseeable expenses associated with the asset;

(10) The amount of social security benefits available to each spouse; and

(11) Such other factors as are necessary to consider the equities between the parties.

4. The wife made the greatest contribution to the acquisition and preservation of marital assets. The husband made few such contributions. The husband was responsible for the dissipation of marital assets and the separate assets of the wife.

* * *

5. Each party has significant separate property due to inheritances although, as indicated above, some of wife's separate assets have been dissipated by the husband.

6. Neither party had significant estates at the time of their marriage.

7. The husband claims an inability to pay the HELOC or his other responsibilities. However, the husband does have a retirement account which he can access at age 56. Also, the husband has ownership in real estate which can generate cash and/or income. Finally, the husband can get a job.

The wife is employed with a family business . . . and still has significant holdings. Both parties are in a position to support themselves.

The other factors listed in T.C.A. 36-4-121 are not applicable to the facts of this case.

As set forth above, the trial court initially valued the marital assets at $1,764,281. It awarded Wife $913,792 (52%) of the marital assets and awarded $850,489 (48%) to Husband. Subsequently, the court agreed with Wife's position that two of her Edwards' accounts, totally $326,372, the "children's education account" and the "beneficiary account," both funded entirely with her inheritances, were Wife's separate property and awarded them to her as such. Despite the removal of these accounts from the marital estate, however, the court declined to upwardly adjust its award to Wife in the division of the remaining marital property upon finding that the award to her remained equitable. The result of the amended judgment was that there were total marital assets valued at $1,437,909 of which Wife was awarded $587,420 or 41%, while Husband received $850,489 or 59%. When Husband's obligation to pay Wife $327,000 is factored in, Wife's share of the *net* marital estate is $914,420 (64%) and Husband will receive $523,489 (36%).

Although Husband complains that Wife was awarded marital assets including her retirement and defined benefits plans and stocks and other inherited assets, his disagreement with the overall property division is essentially focused on the marital home and the court's allocation of the related debt. "The division of the marital estate includes both the division of the marital property and the allocation of the marital debt. Trial courts have not completely divided a marital estate until they have allocated both the marital property and the marital debt." *Owens v. Owens*, 241 S.W.3d at 490; *Robertson v. Robertson*, 76 S.W.3d 337, 341 (Tenn. 2002). Accordingly, our review of the overall

-18-

property division must take into account the trial court's allocation of the marital debt. In this regard, the trial court made extensive findings of fact as follows:

> The husband had an outstanding loan with Pioneer Bank (now Regions) which is his separate debt. There is no evidence that any of the proceeds of that debt were used for the wife or any member of the family. In fact, as stated earlier, the wife thought the purpose of the HELOC was to pay that debt. The husband admitted at the hearing he did not do so. This is the husband's separate debt.
>
> The HELOC is obviously a marital debt. Security for this debt is the marital home and it was incurred during the marriage. The question is how responsibility for payment of that debt will be allocated. Considering the factors relevant to deciding how to allocate responsibility for the debt, the Court finds the following:
>
> 1. The debt was incurred to provide money for the husband to continue the lifestyle to which he had been accustomed even though, after 1995, he was unemployed.
>
> 2. Although both parties signed the HELOC agreement, the debt was incurred for the benefit of the husband.
>
> 3. The husband is the only person who benefitted from the proceeds of this loan. There is no evidence that any of the money went for anyone other than him.
>
> In determining who will be responsible for payment of the HELOC, it is necessary to deal with the I.O.U.'s the husband gave the wife. It is clear to the Court the I.O.U.'s are enforceable. In Bratton v. Bratton, the court held that post-nuptial agreements are valid and enforceable.
>
> The Court finds that all of the I.O.U.'s, except the one dated October 3, 2004, which relates to educational expenses, relate directly to the money the husband took from the HELOC which was secured by the family home. As noted previously, there is no evidence that any of the money was used for the benefit of anyone other than the husband. The I.O.U.'s, which are enforceable under the law, represent promised repayment of the money the husband took out of the marital home through the HELOC.
>
> This Court considered making the husband responsible for the entire amount of the HELOC. However, with the wife being awarded possession of the marital home, that would put her in a position of

dependence on the husband for payment of the HELOC to avoid foreclosure. Therefore, the Court rules that:

1. [Husband] will pay [Wife] $327,000.00[7] for repayment of the HELOC and the I.O.U. relating to educational expenses. This money is to be paid to the wife within two years of the date of this Order. The husband has real estate and other assets against which he can borrow this money. Ten percent (10%) interest per annum will accrue against any amount unpaid from the date of the Order until fully paid.

2. The wife will be granted a lien against the separate real property of the husband, including his undivided interest in Lookout Mountain real estate.

3. The wife will assume responsibility for payment of the HELOC. Upon full payment of the amount awarded in the [preceding] paragraph, all I.O.U.'s will be considered forgiven. . . . The husband contends he should not be held responsible for the HELOC and presumably for the I.O.U.'s, because he was suffering the effects of his alcoholism. The evidence is clear from the testimony of the husband's close friends and his wife, that, while he drank heavily at times, it was only after 1995, when he chose not to continue working, that his alcoholism made him, in effect, unable to function. Both the husband's friends and his wife urged him to find work and told him that it was not good for him or his family for him to sit around the house all day. Finally, the wife enlisted the help of the husband's friends to conduct an intervention to get him into treatment which seems to have been effective. The Court has taken this into account and finds that it would not be equitable under all the facts . . . to excuse the husband from all responsibility for the HELOC and the I.O.U.'s. As stated previously, he has assets and the ability to make the payments and equity demands that he do so.

In completing its division of property, the trial court focused, as does Husband here, on the parties' only debt at issue – the HELOC – and its detrimental affect on their most significant marital asset – the marital home. The trial court's detailed findings reflect that he considered various options, but ultimately determined that the equities favored awarding the home to Wife, while effectively holding Husband responsible for the substantial encumbrance that he alone caused. In our view, the trial court's disposition simply attempted to effectuate Husband's repeated promises to Wife that he would sell his own property to repay the funds he had spent for his own purposes and thereby remove the lien on their home. Considering all of the relevant factors, we conclude that the

---

[7]The trial court explained that "$257,000 is owed on the HELOC" and the "amount of husband's share of the educational expenses is $70,000."

evidence does not preponderate against the trial court's findings with respect to the overall division of the marital estate. The end result is equitable.

B.

Husband takes issue with the trial court's finding that he dissipated separate and marital assets. Husband admits that he essentially lived off of the HELOC for several years and that Wife was eventually forced to use her separate assets to make the payments, but he disputes the trial court's finding that his actions constitute dissipation. The gist of his argument seems to be that the trial court improperly held him accountable for his spending despite the fact that, as Husband sees it, his alcoholism was "inextricably intertwined with the use of the HELOC" funds. Husband adds that Wife is an educated woman with a responsible job who was "not ignorant of the climbing dollar amount of the HELOC," seemingly suggesting that she was at least partly accountable for the funds Husband spent.

In *Altman v. Altman*, 181 S.W.3d 676, 682 (Tenn. Ct. App. 1995), this court discussed dissipation as follows:

> Dissipation of marital property occurs when one spouse uses marital property, frivolously and without justification, for a purpose unrelated to the marriage and at a time when the marriage is breaking down. Dissipation involves intentional or purposeful conduct . . . that has the effect of reducing the funds available for equitable distribution.
>
> Whether a particular course of conduct constitutes a dissipation depends on the particular facts of the case. The party claiming that dissipation has occurred has the burden of persuasion and the initial burden of production. After the party alleging dissipation establishes a prima facie case that marital funds have been dissipated, the burden shifts to the party who spent the money to present evidence sufficient to show that the challenged expenditures were appropriate.
>
> An equitable division of marital property requires a thoughtful consideration of all the relevant factors listed in Tenn. Code Ann. § 36-4-121(c). Dissipation is not a separate factor. To the contrary, the allegedly improper or wasteful expenditure or transaction must be considered in the context of the marriage as a whole, and it must be weighed along with all the other relevant factors in the case. The factors that courts most frequently consider when determining whether a particular expenditure or transaction amounts to dissipation include: (1) whether the expenditure benefitted the marriage or was made for a purpose entirely unrelated to the marriage; (2) whether the expenditure or transaction occurred when the parties were experiencing marital difficulties or were contemplating divorce; (3) whether the expenditure was excessive or de minimis; and (4)

-21-

whether the dissipating party intended to hide, deplete, or divert a marital asset.

The concept of dissipation is clearly relevant to the division of marital property. Pursuant to Tenn. Code Ann. Sec. 36-4-121(c)(5), the trial court must consider, as one factor, the contribution of each party to the acquisition, preservation, appreciation, depreciation, or *dissipation* of the parties' marital or separate property in fashioning an equitable division of the marital property. In support of its finding in the present case, the trial court stated:

> The husband has not been employed since leaving A.G.Edwards in 1995, although the wife and close friends urged him to find work. Husband testified he had a loan from Pioneer Bank from before the marriage which he had chosen not to pay off while he was working. After leaving A.G.Edwards, the husband decided to take out a . . . HELOC on the house to give him money to pay his expenses, including the dues for his golf and social clubs and weekend spending money. The wife, whose testimony the Court found credible, stated she thought the HELOC was to be used to pay off the Pioneer Bank loan. Eventually, it became clear the balance owed on the HELOC was accelerating rapidly and the husband was not making the payments. The wife used separate assets to pay the HELOC. The husband signed several I.O.U.'s. . . . As of August 30, 2007, the balance on the HELOC was well in excess of $250,000.00 and the house had been threatened with foreclosure because of non-payment of the HELOC by the husband.
>
> According to . . . an expert witness called by the wife, the value of the home in September 2006 was approximately $500,000.00. Therefore, due to the husband's refusal to work and his reckless spending, a $500,000.00 unencumbered asset has a lien of over $250,000.00 and is threatened by foreclosure. It is clear the husband has dissipated marital assets and the separate assets of his wife.

We conclude that the evidence does not preponderate against the trial court's finding of dissipation of assets by Husband. "The concept of dissipation is based on waste." *Altman*, 181 S.W.3d at 681. Among the relevant factors, the trial court certainly considered that Husband's expenditures were unnecessary in that they benefitted only him, not the marriage or household and that they were excessive and "reckless" coming at a time when he had stopped working. The trial court did not err in characterizing Husband's spending of the HELOC funds and the resulting encumbrance of the marital home as dissipation and considering this as one factor in its division of the marital estate.

In our view, the trial court's "dissipation" finding, even if erroneous, would not alter the equitable nature of the trial court's division of marital property. Either way, the evidence does not preponderate against the trial court's division of marital property and debt.

VII.

A.

We address together the issues raised regarding attorney's fees at trial and, with respect to Wife, on appeal. First, Husband asserts that the trial court erred in awarding Wife her attorney fees for services rendered in the trial court. His argument, though not entirely clear, seems to be that Wife is not entitled to her attorney's fee because she is capable of paying the fee and because she did not file a motion requesting such an award. As to the latter point, it is easily dismissed based on the express request for attorney's fees and costs contained in her complaint. Second, Husband argues he was entitled to his attorney's fees based on his showing that he was the disadvantaged spouse that lacks resources to pay his attorney.

As a general matter, litigants are expected to be responsible for their own attorney's fees in the absence of a statute or contractual provision otherwise. *Elliott v. Elliott*, 149 S.W.3d 77, 88 (Tenn. Ct. App. 2004)(citing *John Kohl & Co. v. Dearborn & Ewing*, 977 S.W.2d 528, 534 (Tenn. 1998); *Massachusetts Mut. Life Ins. Co. v. Jefferson*, 104 S.W.3d 13, 33 (Tenn. Ct. App. 2002)).

In a divorce action, an award of attorney's fees is treated as an award of alimony in solido. *See Smith v. Smith*, 912 S.W.2d 155, 161 (Tenn. Ct. App. 1995); *Gilliam v. Gilliam*, 776 S.W.2d 81, 86 (Tenn. Ct. App. 1988). Thus, in deciding whether an award of attorney's fees is appropriate, a trial court must consider the same factors that are used when considering an award of alimony. *Kincaid v. Kincaid*, 912 S.W.2d at 144. As with alimony then, need is the critical factor to be considered by the court when deciding whether to award attorney's fees. *Herrera v. Herrera*, 944 S.W.2d 379, 390 (Tenn. Ct. App. 1996). In this regard, a party is entitled to attorney's fees when he or she lacks sufficient funds to pay his or her legal expenses or would be required to deplete other assets to do so. *See Brown v. Brown*, 913 S.W.2d 163, 170 (Tenn. Ct. App. 1994); *Kincaid*, 912 S.W.2d at 144. The decision to award attorney's fees lies within the sound discretion of the trial judge, *see Aaron v. Aaron*, 909 S.W.2d at 411; *Brown v. Brown*, 913 S.W.2d at 170, and we will not interfere with the trial judge's decision unless the evidence preponderates against it. *See Batson v. Batson*, 769 S.W.2d 849, 862 (Tenn. Ct. App. 1988).

Wife has the financial resources to pay her own attorney's fees. Therefore, the award of fees against Husband is hereby reversed.

With respect to Husband's issue pertaining to the trial court's refusal to award him fees against Wife, we find no error. The evidence does not preponderate against the trial court's refusal to award Husband his fees. Both sides have the resources to pay their own counsel.

B.

As noted, Wife requests that she be awarded her reasonable attorney's fees for defending this appeal. Wife submits that every issue Husband raised required the exercise of the trial court's discretion and its findings in support of its rulings were firmly supported by the evidence. She

submit that she should not be required to "expend even more of her separate estate" on this appeal.

The decision whether to award attorney's fees on appeal is a matter within the sole discretion of this court. *See* ***Archer v. Archer***, 907 S.W.2d 412, 419 (Tenn. Ct. App. 1995). The appellate courts in this state have set forth the factors that should be applied when considering a request for attorney's fees incurred on appeal. These factors include the ability of the requesting party to pay fees, the requesting party's success in the appeal, whether the requesting party sought the appeal in good faith, and any other equitable factor that need be considered. *See* ***Dulin v. Dulin***, W2001-02969-COA-R3-CV, 2003 Tenn. App. LEXIS 628, 2003 WL 22071454, at *10 (Tenn. Ct. App. Sept. 3, 2003) (citing ***Folk v. Folk***, 210 Tenn. 367, 357 S.W.2d 828, 829 (Tenn. 1962)). Wife has the resources to pay her own fees. Accordingly, her request for an award of fees against Husband for appellate work is hereby denied.

## VIII.

That portion of the trial court's judgment awarding Wife her attorney's fees for trial work and discretionary costs is hereby reversed. In all other respects, the judgment is affirmed. This case is remanded to the trial court, pursuant to applicable law, for enforcement of that portion of the trial court's judgment not reversed herein and for collection of costs assessed below. Costs on appeal are taxed against the appellant, Lynn Lampton Deakins.

_____
CHARLES D. SUSANO, JR., JUDGE